Before we get to our business this morning, our scheduled business, we have other important business. Admission to the bar of our law clerks. I am the move-in for two of them, and so Kevin and Angela, would you stand, please? First, I move the admission of Kevin Richards, who is a member of the Barons in a good standing at the highest court of Virginia. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. I also move the admission of Angela Silvers, who is a member of the Barons in good standing with the highest court of Utah. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. These are the statements that are standard and that I'm obligated to make. I am not obligated to point out, as I'm about to, that they are both outstanding people. They have worked for me for one or two years, greatly assisted in the performance of my work. They are very smart and they are hard-working. The commission on my wall says that I, just like my colleagues' commissions, have wisdom, uprightness, and learning, but whatever learning I have has been enhanced by working with them. I have no doubt that they will be successful in the future, so I move their admission to our Bar. That's a tough act to follow. That was really lovely. I move the admission of my clerk, Jessica Delaglio, who is a member of the Barons in good standing with the highest court of Massachusetts. I have knowledge of her credentials and I'm satisfied she possesses the necessary qualifications. Baby Jessica is all grown up. She has been our baby clerk. We call her that because she's the youngest clerk I've ever had. She's also incredibly accomplished for such a young age. What I like best about her is the maturity with which she holds herself out and carries herself, the uprightness, the forthrightness, the morality. She is a wonderful person in the thoughtful way in which she approaches everything she does and all the people she interacts with. She has been a wonderful law clerk to me over the last year, and I have no doubt that she's going to go on to a great and successful career. Hopefully, someday she'll stand here in front of us and argue, but I've just really thoroughly enjoyed having your company over the last year and a half. Thank you for doing that for me, and I'm happy to move your admission. Judge O'Malley, what do you think? Are you going to let these kids in? I am the deciding vote here because they are both conflicted out. I think after much deliberation, I accept the proposition that all of these children, not so children anymore, are wonderfully accomplished and that they will be a welcome admission to this bar. Would you all approach the well and be prepared to take the oath from the circuit executive? Do you solemnly swear that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. To our scheduled business, we have five cases on the calendar this morning, two patent cases, one from the Patent Office and one from the District Court, two cases from the Court of Federal Claims and a government employee case. One of the Federal Claims cases is being submitted in the briefs and will therefore not be argued. First case is In Re Steppen Company, 2016-1811, Mr. Wim Biskus. Good morning, Your Honor. May it please the Court, Counsel, this case proceeds from a decision of the Patent Trial and Appeal Board rejecting all the pending application claims for obviousness. The Board's decision we submit demonstrates the risks of assessing the issue of obviousness untethered to the constraints imposed by KSR and the decisions of this court. I'm going to focus on three errors that are briefed in further detail. First, the Board erred because there was no showing of a reasonable expectation of success or a motivation to select and combine from amongst an infinite number of surfactants disclosed in the FALA specification. And further, the only examples used in the recited amine oxide were failures at a less stringent cloud point test. Just out of curiosity, before you go on, let's just start with this point. Your claims are so strikingly broad themselves. So your complaint is that the prior art discusses, I mean it's like what you get, there's two of 22 in the one case, that's one out of 231 possibilities. So that's not infinite, but then I realize there's the third element. But you, certainly if I were looking at your dependent claims, which you don't separately argue, there are some that are shockingly narrow and the world of possibilities in the prior art quite broad, but you don't separately argue those. Your claim one is immensely broad with 10 to 60% weight of, I'm going to call it DA because I don't think I can say it, whatever it is, and then 5 to 30% of the water soluble plizers and then 30 to 75% of the amine oxides. I mean you see these percentages are so broad and there's an admission in this record that a lot of the combinations would not produce the cloud point at 70 degrees Celsius as necessary. And so you're complaining the prior art is so broad with so many possibilities, but so is your claim, your claim one. So what do you think about that? The response to that, your honor, is Stepan is the first to discover that a specific five component combination can yield these exceptional results, including a cloud point above 70 degrees Celsius. What's so magical about 70 degree cloud point? If you're talking about making a new compound, say, maybe it works, maybe it doesn't, but here you've got this broad prior art and you've got this broad claim and what's so magical about 70 degrees? Well, first of all, if I may, Stepan has demonstrated by specific working examples that it has invented and has identified the specific combination that does provide these results. That's not in Pallas, so it's a completely different situation, it's a different disclosure, and it's a more limited invention supported by the examples. The dependent claims reflect that. Some of your dependent claims are quite narrow, but this independent claim seems quite broad. Well, we do argue, first of all, dependent claims 26 and 27, I believe, which are PAG and PEG related, so we do call those out separately, but my point is, with respect to the broad claim, Stepan does have examples, working examples of success where the prior art failed. Prior art doesn't have that support. I think that's where we need to focus, and that's what I think George-Laurie's question was really trying to get at. What is the magic of the above 70 cloud point? It's clear that in Pallas, they were hoping for higher cloud points, but they kept failing with the amine oxide combination, so why is that final requirement that you call out so critical? Well, the final requirement in Stepan's claims is it's a five-component composition made up of dioxylated alkyl amine, a first cationic, a water miscible solubilizer, and then an amine oxide, a second cationic, in combination with water and over 39% glyphosate salt. So it's that specific combination that is the subject of what's said to be a broad claim of Stepan, but it's supported by working examples that you can achieve that superior cloud point. And that's why I think you're missing. Oh, and what is the benefit of the cloud point? Because if I'm just looking at Pallas, there's lots of different things you can put together, and so maybe I can put these things together. And apparently, from what you're saying, is you don't think Pallas would teach that there'd be a reasonable expectation of succeeding with the cloud point. So what's the magic of that cloud point? So if I understand you right, and I'm sorry, Your Honor, Judge O'Malley, the benefit is in the processing and handling of this material. It's touched upon in the briefs. It's also touched upon in the specification. But when you're manufacturing this, it's made at a high temperature. And if you have to wait for it to cool before you can add the surfactant component, that's a significant hindrance in the processing. Right. I got that. I got high cloud point. I got why that's important. But why 60 versus 70? Why is 60 versus 70? Stephanie had achieved a higher cloud point than anything in the prior art with a specific combination. And 70 degrees was a point deemed to be very pertinent for the processing benefits. And so 70 degrees was supported by the working examples, and 70 degrees ended up in the claims. So as I understand it, Pallas never even got to the 60 degree using an amine oxide. Is that right? True. Pallas never got any success. He only had failures in terms of testings with amine oxides. But Pallas was a disclosure of 60 degrees. It was a very broad disclosure with a lot of possibilities, as Judge Moore pointed out. Right. It's an infinite number of possibilities, and that was one of the main points. So Pallas wasn't a failed disclosure. It was a broad disclosure with mixed results. Right. Limited results, but a failure with amine oxide. But it's a teaching of whatever it disclosed. It's a teaching for whatever it discloses. And what it discloses is we tested amine oxide for cloud point at a lower 60 degree cloud point test with a less than the claimed amount of glyphosate, and we failed. That's the teaching that comes out of Pallas. It also teaches failures with water miscible solubilizers, that's the polyethylene glycol, squarely within the claims of the step and combination failure. So we have this infinite number of surfactants disclosed in this catalog, a 14-page catalog of the Pallas specification, categories A through B, and then additional paragraphs added on, and we went through some math, and we said each one of these classes could be quadrillions of possible surfactants. And it goes on and on, and there's no teaching of any predictability in the art. Pallas not only proves that point because he tests up and down. You can go through pages and pages of failures in Pallas, and we've done some of that, we pointed out in our brief that Appendix 778 and 780, and you can page on from there and you'll see failure after failure mixed with some success. But now with amine oxide and not with the step and combination, Pallas didn't even test the three-component surfactant system claimed by Stepan. What's your response to the argument that this would just be routine optimization? Routine optimization requires a reasonable expectation of success. It's in the case law, and here there is no reasonable expectation of success. One thing that's glaring in this case is that the board mistakenly took excerpts from two portions of the record, combined them in an error, and thought and believed that Pallas example 127 had no failures with amine oxide. That was glaringly wrong. It's not disputed that the board's reasoning was wrong. But to your point, Your Honor, set aside that glaring error in reasoning. You need to have a reasonable expectation of success to rely upon routine optimization. And here the record screams there is no reasonable expectation of success. You call out in your application, you say, well, this is really unexpected that we've been able to put these things together and achieve this. But you didn't put in actual evidence of unexpected results, did you? We didn't put in declaration evidence, but we have our own specification which provides the teachings of what it shows, but we don't have to go there. Once you establish a prima facie case of obviousness, and we submit that the PTO did not come close to that threshold, so we have no obligation or burden, yet we did come in in our brief and we said in our view that there was still unexpected results, and we went through some portion of the briefing on that. But that is really a backstop argument because we have no burden. The burden is on the PTO in the first instance to show a reasonable expectation of success if you're going to rely upon a routine optimization argument. And here I think this case is very much like the Otsuka Pharmaceuticals case. We put it in our brief, and there the court noted that the prior art reference, the 2,3-dichloropropoxy compound, is one of hundreds of examples that may be useful for the application. May be useful, but the court went on to say that the reference fails to tie 2,3-dichloropropoxy to any meaningful suggestion of antipsychotic activity, desired activity, and that's similar to this case because Pallas fails to tie amine oxide to any meaningful suggestion of success or any desired activity. You need to have that reasonable expectation of success, and I think Otsuka Pharmaceuticals is very much on point. Briefly, I'll address the fact that the PTO has looked at the specification and said, look, they have to deal with the fact that it discloses an infinite number of surfactants and an infinite number of combinations, and how can we pare that down? They make three pairing arguments, and each of them are unsupported. They first argue that this 14 of the columns, classifications, maybe it's a dozen pages, classifications A through V, well, those are just effective, not preferred by Pallas, but that's not accurate. Pallas describes them all as both effective and preferred. The PTO then points to paragraph 130 and says, let's look at this paragraph to the exclusion of everything else in Pallas, which is improper. You can't pick and choose. You need to look at the reference as a whole. But even if you look at that, they say it's only two of the four classes in that paragraph 130, but as you know, that's improper. But we called out, if you're going to look at specifically listed excipients, there are 100 others throughout the case, throughout the Pallas reference, 100, and none of those are amine oxide. So it shows that you can't make these arguments. They're trying very hard to make this pared-down list, and the Pallas doesn't support it. They next argue that, well, we only need to pick two out of 22 classifications, but that argument fails because, as we pointed out, one classification can contain quadrillions of members, and you need to test. And that's key. Pallas says, I need to test to see what works because there's no predictability in this ARF. There is none. You need to test from these quadrillions of potential surfactants, so you can't simply rely upon classifications. And the argument also ignores that the claim to mention here is multiple classes of surfactants in combination with the water miscible solubilizer, so I can't just pick a class. You know what your problem is? Even though you've got a very broad piece of prior art, you've got a very broad claim. Well, our claim is supported, though, by the working examples. That's why I would beg to be the difference. Pallas says it has broad claims, but I don't think they're supported. But certainly the teaching in Pallas doesn't teach the breadth of our claims. It's still picking and choosing, hitting or miss, trial and error, with no predictability in the art. And Pallas not only says there's no predictability, it demonstrates it. He demonstrates it by the tests he's done, where he looked at 1,200 formulations. He found there's no predictability. Would you like to save your rebuttal time? Yes, Your Honor. Thank you very much. Mr. Helm. Thank you, Your Honor. May it please the Court. I think the prior art that Pallas referenced in this case just reflects the fact that this is an incredibly crowded art field. It has to do with a well-known herbicide, which is the Monsanto Roundup product, in combination with a known quality, the Cloud Point. All of these issues were known, including a wide range of surfactants that could be used in compatibility with that glyphosate herbicide. I'm with you on motivation to combine. Reasonable expectation of success is a bit of a problem for me, though, because then you understand you can't conflate the two concepts. They have to both be addressed and analyzed. And there is this issue of the 70-degree Cloud Point, and in Pallas they never even got to 60 degrees using the amine oxide. So where is it in the opinion that the Board says that there's a reasonable expectation of succeeding to that Cloud Point by coming up with some of the combinations in Pallas or using the combinations in Pallas? Well, what the Board did was they found that it would be a matter of routine optimization to take the disclosure of Pallas and then subsequently identify the 70-degree Cloud Point. They said that. That's right. But there's two problems. One is, what they said is, well, Severin didn't disprove that it would be routine optimization. That's right. That's putting the burden in the wrong place, right? Yes, but if it was that alone, then yes, that would be putting the burden in the wrong place. So what did the Board rely upon? Was there anything in the record about what one of skill in the art would have understood about how routine optimization with this combination could get you to someplace where Pallas failed every time? Sure. And so in the Pallas art, when they discuss the preferred surfactants that they use, this is at A754, paragraphs 130 and 131, what they say is that the suitable cationic surfactants can be determined by those skill in the art by routine experimentation. Well, they say that, but they couldn't get there. Did Pallas fail? Excuse me, Your Honor. Did Pallas fail? No, I don't think Pallas failed at all. I think those two questions are related. So what Pallas did was they took and under – what Pallas illustrates is that routine experimentation does have some failures involved, but it also is a matter of routine experimentation to test a very large number of combinations and then find the ones that actually do work. But isn't it correct that the Board erred, in fact, misquoted them on page A9 regarding Pallas and whether or not the example 127 includes amine oxide? That's a failure. That was one of the failures in Pallas. And the Board said, well, this failure isn't relevant because it doesn't include amine oxide, but it clearly does, doesn't it? Your Honor, this is – the Board did misquote here. This was an incorrect quote. Well, it misquoted and resulted in inaccurate fact-finding on their point because to the extent that they found that this failure didn't have the amine oxide and the thing I'll call DA because I can't figure out how to pronounce it. Yes, feel free. That was a mistake by the Board. So to the extent that they were going down the road of no – when they were talking about reasonable expectation of success and they were looking at failures in Pallas and they said, well, this is a failure but it's not relevant because it doesn't contain the claimed elements, they were incorrect. Now, I know it doesn't have the water miscible thingy. That's right. But it does have the other two key claim elements. So I feel like that was a pretty big factual error by the Board because in the course of figuring out reasonable expectation of success where there are a lot of disclosed possible combinations, they disregarded this failure as irrelevant when actually it's probably the most relevant example in the entire disclosure. I don't know that I would agree that's necessarily the most relevant portion of the disclosure. But it's highly relevant. It's a reasonable expectation of success analysis. It could be relevant for sure. But I will say that the disclosure as a whole identifies – to say that you would be led away from using the – what you termed as the DA in the – How do you actually pronounce it? I believe that that's the di-alcoxylated alkylamine. Is that the one? Let's try di-alcoxylated alkylamines. Yes. That sounds good to me. That's why we keep them around. Yes. I will continue to refer to it as DA because that didn't actually help. Very good. But when there's four categories of preferred surfactants listed and one of them is the thing that we're worried about is the amine oxide, the fact that some of those don't work, frankly, that's to be expected that some of them will not work. Of course. In fairness, Palace says everything's preferred, right? You keep saying they list these preferred elements, but they pretty much say everything's preferred. Their position is that this long list is all preferred, and what Palace actually says on A740 and then on A741 is that they say, we're going to tell you what the preferred surfactants are listed below. Then they say cationic surfactant's effective. They have this long laundry list, and then on A754, which is below, they say some preferred cationic surfactants. And so here in paragraph 130, A754, they tell you four categories of the preferred surfactants. And so I don't actually think that's right that there's whatever it is, 22 categories of preferred surfactants. I think it's actually a much smaller group. But did the board ever cite that paragraph or quote it or mention it in its opinion? I mean, it's actually a good point by you, but I feel like it's a point by you. Well, thank you, Your Honor. I feel like it's a point by the solicitor's office and not a point that actually was identified or informed in the board's decision. I'm not sure that the board actually cited that paragraph. Or quoted it or mentioned it. No, but they did find that this – they found that these were the preferred surfactants. I think this is completely consistent with that. I feel like we're just completely ignoring the fact that no matter how broad this claim is, at the end of the day, the claim has a very express requirement that you have to be above 70 degree plow point. And there's nothing in Pallas that talks about that or shows any combination that achieves that. Well, the way that I've looked at it is that what Pallas discloses is a range, which is 60 or above. And then they're claiming a subset of that range, which is 70 or above. And so in that situation, typically you have to show some sort of criticality to moving that modest change in temperature. Except the problem was in Pallas, the one – the example – what is it, 127, I think? I have to look at my little screen if you're out. That's right. Where they had the amine oxide and the DA stuff at 60 degrees didn't work. Even at 60. Right, at 60. That's what I'm saying. So what would be the incentive to use these exact same ingredients, I'll call them, and then try to get it to be – because it's – make sure I understand this. I don't fully understand this cloud point thing. So cloud point is – has something to do with the separation of the chemicals, right? I – yes. And so you want it to have a cloud point above 70 degrees because you're combining these ingredients and it's hot when – the composition is hot when you're doing it. And so you want it to have this cloud point that doesn't occur until you're at least this certain point because that would be a more efficient manufacturing process. You won't have to cool it down before making certain combinations. Does that sound right? I think that's generally right. I think just simply it is because you want something that's clear and not something that's cloudy. I think that's maybe another way to put it. But – and what Pallas says is you can get things that are clear, which Pallas equates to storage stability at up to 60 and above is what's desirable. This is what you should screen for. And then they go and they have many, many – But see, that goes again to Judge O'Malley's point, which I tend to agree with, which is I'm not surprised people might try. It might – Pallas creates an obvious to try or a motivation to try. Right. But it's the success that I'm also in the same boat as she is, I think, with her questions that I'm just wondering why when the failure occurred with this combination and you had a cloud – you had a failure, you couldn't get the cloud point to even work at a 60-degree level. What's the expectation of success with the same compositions? I mean, yeah, it says try lots of different things, but I don't know. What is the role of reasonable expectation of success here? We're not talking about combining two references where reasonable expectation of success is really important. We're talking about taking a reference and varying it and moving on to not a particular target. Prior art didn't say 70 degrees is a special goal and no one has obtained it before. So where does the concept of reasonable expectation of success come in, if at all, when you have one reference? Right. I'm not sure that it's – I'm not sure that it really makes all that much of a difference in the context of this reference. But is it a sound test? Whether it's reasonable expectation of success is that the – Is that a sound test for whether it is obvious to take a broad disclosure and move around and try to improve it? I think it would be in a case – I do think that it's a case-specific situation. So, for example, if this was a pharmaceutical case where you were looking for something that had biological activity, reasonable expectations of success might be paramount because you really have – because it's so uncertain. And the difficulty in the optimization is so high in those cases. But in this situation, we're not dealing – it is a chemical art, but we're not dealing with that type of instance. And here, what we're – all we're looking at, and I talked about earlier, was whether the solution is clear or not. It's a test that can literally be run in thousandfold in short periods of time. So screening, just as Pallas did, screening many, many different combinations is simply what people in the art, in this particular art, could and did do. Whether there were failures doesn't enter into the equation, I think, in this type of situation where, yes, there will be failures, but we can test thousands. And so we can tell you what the failures are so quickly that whether or not it's – we have an expectation that any particular one will work, we can tell you which ones will work. Just let us run the test. I guess I'm just having a hard time on this fallback of routine optimization because, theoretically, the board could cite to that anytime or a district board could cite to that anytime and say, end of inquiry. So we never got to this one admitted element of the claim, but we could just say they would routinely do it. And I just feel like there needs to be something more concrete to point us to something in the record that says that one of skill in the art would have understood that routine optimization. I know I've already pointed that to you, and I know it's – I can see from your question that you're skeptical of it, but that the art does say that this is routine optimization. It says that in those words, that it's routine optimization to pick out these surfactants. Maybe, and I mean I'm just speaking off the cuff, but maybe the test isn't quite right. I guess Judge Shuler reframed it as do we need a reasonable expectation of success in this scenario, and you, I think, very reasonably pushed back and said, yes, there's probably still a role for it. I'm, you know, kind of putting words in your mouth a little bit, but that's sort of what you said and you explained it. But maybe the real answer is when the experimentation is so simple and so easy to do, the fact that the art might discourage you from certain combinations wouldn't discourage a reasonable artisan in this field from trying them. But we need the board to say that. That's got to be – there has to be a fact-finding, right? There has to be a statement of in this art people are doing – like Palace did over a thousand experiments. Right, exactly. Right? Yes. And so if the board could come along in a fact-finding, I mean it might actually really help the law because maybe a reasonable expectation of success, you know, when you have to seek FDA approval on something, right, the number of hoops you have to jump through, the expense, the difficulty of performing the test would discourage people in certain situations. In this situation, your argument, which is actually really resonating with me as a meaningful tweak on the law, probably ought to take into account, in a way that I don't think we have in our case law, what would a skilled artisan do? How much failure would they tolerate? How easy is the testing? How cheap is the testing? All of that sort of thing. That's right. And I think even more, and just to add one additional thing onto that, with what Pallas, the type of thing that Pallas disclosed, where they disclosed glyphosate combinations with surfactants that achieved the higher cloud point, identified the higher cloud point, it's not just, there's not a motivation combined in the sense that it's a single prior art reference, but it does show you that people skilled in the art were looking at that variable and trying to optimize that variable. Let me ask you a related question, Mr. Helm. This is a composition claim, A, B, C, and D. Yes. The cloud point is a result. Yes, Your Honor. Right? It's not a component. All the components are in the prior art. That is absolutely right. And so to practice the claims, they're very broad, and I think you observed during the initial questioning, they're very broad. And so there is this kind of part and parcel of, to practice those claims, you'd have to undergo the same routine optimization or routine experimentation. And to the extent that this result is considered to be important, there's been no showing that 70% is really good and 60% isn't good. Yes. Yes, Your Honor. But the composition of the components are in the prior art together. That's right. That's what's missing from the record. The evidence is specific. That might be helpful. That routine experimentation language that you talk about from the palace, did the board ever cite to that language? No. I think Judge Moore asked that same question, Your Honor. And all they said was that they identified these as preferred, and I don't think they found that would be routine optimization, but I don't think they cited specifically to that language. And one last point, if I may, if that's okay, that this is the type of case where secondary considerations I think would be especially probative. Because the art is so crowded and because it seems like everything is there, secondary considerations could make a huge difference in a case like this, but there aren't any secondary considerations in this case. Thank you. Thank you very much, Your Honor. Mr. Willis, just a few minutes. Thank you, Your Honor. Two and a half minutes. I'll be brief. I want to point out a couple of things. First of all, counsel referred to, and the court referred to, paragraph 70 regarding the beginning of these categories, A through U or V. At appendix 740 it says, preferred cationic and anionic surfactants effective in formulating, and it goes on from there. All of that catalog listing, 22 classifications, deals with preferred, so-called preferred cationics. So there should be no question there. Secondly, Stepan's examples. Stepan provided 27 working examples that tested CloudPoint, containing amine oxide, using five different amine oxides, and all met the greater than 70 degree CloudPoint test. That's at appendix 42 and 43. Stepan supported its claims, and they're narrowly tailored in the respect of this five-component surfactant combination. I want to make a point because I don't think it's clear. I've been hearing a lot about routine optimization, and I think there's a confusion here about it might be routine to test, but that does not equate with routine optimization under the case law. Routine optimization under the case law requires a reasonable expectation of success. There's no carve-out that we've seen, and nothing's been cited, that says in a one-reference case, I don't need to worry about a reasonable expectation of success. I think the law requires that. Otherwise, you're picking and choosing. Well, I don't know that your argument is fair. I didn't understand the PTO to suggest that you should do away with the reasonable expectation of success. I think that what you need to address is Mr. Helm's point, which I think is a very good one, which is in a field like this, where you can, like Alice Pallas did, actually test 1,000 different samples in the span of minutes. That's not in the record. It is in the record that Pallas tested 1,000. But there's no span of minutes that's been cited that I've seen. I think that came from counsel. I see. So maybe that's exactly what I want you to do, maybe not quite as defensively as you just did, but maybe argue to me and explain why, even though he might have a point which is resonating with me, because it is, the idea that reasonable expectation of success... So what, that Pallas has one example, example 127, which actually failed. When you have something, if you do have something, that's easy and cheap to test, and if the kind of people who would be doing these tests would routinely test thousands of samples at once at low cost, maybe they're not dissuaded by example 127 in Pallas. So maybe your argument then is, go ahead. The argument is that you need to have a basis to select and combine them from amongst the others, and if it's just the fact that I have... And that none of this is in the record. Yeah, well, they have nothing in the record to say it's a matter of minutes to test thousands. I haven't seen that. That's pure, naked, unsupported argument. Well, I think it's actually me. I don't think he said matter of minutes. I think he said something like quickly or easily or something. Well, that's also unsupported and not in the record. Yes, I get it, but... But what is in the record is that the tests with amino oxide were failures. And so no one's going to go to start with what's failed. They're going to go start with something that worked. And you can't undercut that prime effasive requirement of the law by saying, well, you could run many tests in a short amount of time. That would undercut obviousness, and anyone could... Do you have a final thought, counsel? Yes, Your Honor. I'll just close with this. There's a glaring misunderstanding by the board. The board's reasoning was facially incorrect, and that's not disputed. And the board's errors are replete, including the failure to show reasonable expectation of success. And we submit that the case should be reversed. Thank you very much. Thank you. We will take the case under advisement. Thank you.